3-19-0559 In re Marriage of Timothy Washburn-Appley and Kelly Washburn-Appellant Yes, yes. Yes. Yes. Yes. Did you hear me call the case? Yes, yes. So Bill, are you on? Of course, yeah. Oh, I just okay. You want me to proceed it to bring in the present? You know, go ahead. Oh, you Oh, you want me? Okay. Okay. Mr. And it's you're, you're ready to proceed and the Okay, very good. Mr. And it's you may proceed. Thank you. Thank you. Thank you very much. Your honor, may it please the court. For the record, my name is David W. And it's a NDI CH. I represent the respondent apple lot. And that's appeal. Kelly poker jack is her name. With respect to the three issues that we raised in this appeal, your honors, the first and the threshold issue that needs to be decided in this question of the proper division of marital and non marital property in this dissolution case is comes up under section five 503, parentheses, c to a of the Illinois marriage and dissolution of marriage act. And that is a provision, your honors that addresses what is supposed to occur in a dissolution case, when you have situations where one estate in this case, the marital estate makes contributions to the non section require and how should it have been applied to the evidence in this case, we think, of course, that the judge was quite wrong in this decision. Under this section, the excuse me. Before I get to the record, your honors, and the evidence that was introduced in this trial, I just wanted to point out two words and two provisions under 503 c to a. The first one in C, and this is on page a 18. In the appendix, it's attached to the appellant's brief, the preparatory language and see starting out subsection C before you get to a says that marital and non marital property shall be treated. And it uses the mandatory shall be treated in the following manner, unless otherwise agreed by the spouses. Then in this situation, you go down to sub to a underneath C. And the introductory sentence in that sub paragraph says, when one estate of property makes a contribution to another estate of property, the contributing estate shall again, it is mandatory shall be reimbursed from the estate receiving the contribution, notwithstanding any transmutation. So this provision is in essence, an exception to transmutation doctrine. But we believe your honors that it's significant that the court has used that the legislature has used the word twice, the word what shall twice in determining that this distribution is mandatory on the trial court judge. I don't think it changes the burden of in any way, I still think that that remains an abuse of discretion. But I think the fact that let's let your folder use those words is important. And in every case I've read judges, justices, that's never been pointed out by any other court, that there are two shells in this specific provision in deciding this issue of what type of reimbursement should come from the marital properties. Now, in this case, virtually all of the property was non marital property, there's very, very little marital property in this seven year marriage. Specifically, as addressed quite comprehensively, and in detail in our brief, there are four primary properties that the trial court looked at, and we're asking this court to review. One was the home. The second one is a company called Washburn Trucking, that Mr. Washburn owned all of the companies in LLC, since I believe 2001 was when it became an LLC. But it's really two businesses wrapped up in one. Washburn Trucking does over the road, trucking and hauling distances. And it also operates a business within its corporation of trading, buying equipment, selling equipment. There is an extraordinary number of vehicles that were changed and substituted, whatever, during this seven year marriage. And it makes quite a difference in the value, we believe of Washburn Trucking. And I'll get on to the value in a second, a minute or two. There's the third piece of property that was non marital. And Mr. Washburn's is the Morton building. And that is a building that he and his father are paying for. There's a mortgage on this like there is on every other property, just a standard Morton building on the farm property, the two of them own that they're paying a monthly mortgage on. And finally, there is a farm that Mr. Washburn, this is the fourth property, Mr. Washburn owned half of it with his father. As you'll see from our briefs and the record in the case, the monies to pay for the mortgages and decrease the mortgage and increase the net equity in each of these non marital properties throughout the seven year marriage came from a bank account called the family expense account. And the monies would go through that's a marital property account. That's where the family paid the vast majority of its family expenses. For reasons that were not never explained. The Mr. Washburn had this as an account that he placed his business income in and ran both of his businesses of the trading of vehicles and trucks and other types of equipment, as well as the over the road hauling. All of that money, all the income he raised, did not go through Washburn trucking, but rather went through a family expense banking account. So that clearly is not disputed. That is a marital account that then paid down the mortgages for seven years on all of this property. And at the end of the day, when the trial occurred, there was substantial enhancements of value in each of these properties. And it's that substantial value of property that we believe section 503 C2A requires that that goes back or that the substantial value of the enhancement or the contribution that was made one or the other to the marital estate and did not happen here. With respect to values, I would say we cover values in fair detail. In our brief, um, we have asked in the trial court, uh, that the, the proceeds, the, the money that came out of the family expense banking account went to these four assets to reduce the, the debt and increase, uh, Mr. Washburn's, uh, equity in each of them totals $128,722 and 80 cents, 89 cents, excuse me. And if you look at pages, the chart that we have presented to the trial court, now this court on pages 29 and 30, uh, they show you our analysis and our calculations on that amount. Now the, it, in the app police brief, uh, I guess he chides, uh, me or, uh, my client for suggesting that 128,000 is an excessive amount of money, uh, which is, uh, it's, there's no dispute. That's the dollars that came out of the bank account, uh, that we traced. He says that's a preposterous or a very substantial amount of money to be asking Mr. Washburn to pay back to, to the marital estate. Um, and I, it raises another issue, however, uh, in that we may quite frankly be very low. And the reason this issue or sub issue comes up is because during the divorce, Mr. Washburn filed a financial statement under oath that he called the bluegrass state bank. Uh, when he was changing banks from the prior one, uh, international harvester credit unit, he was going from there. He decided he was going to follow a person who went out to, to blue, the bluegrass bank, Iowa bluegrass. So he presents a financial statement that we, there was the respondent introduced his evidence, his exhibit or, and with respect to the values that we were criticized, criticized for so severely in, uh, the brief, he values, uh, to the bank, the 40 acre farm that he and his father own has $480,000, nearly half a million dollars. Mr. Washburn has a half interest in that, uh, that would be a $240,000 asset. He values Washburn trucking company. That's the, the dual, uh, two, two person, two purpose, two function company, uh, for hauling property. He values that in the financial statement is 247,500. Uh, interestingly, his tape, his testimony, he said that, uh, that the, uh, whole company was really only worth the three vehicles that it's still owned at that point. And he placed the value at, uh, approximately $85,000, not the 247,500. He put on his financial statement, the house he valued at 185,000, which is about the same, uh, as it was in, uh, the, the evidence in the trial, the Morton building, Mr. Mr. Washburn, uh, valued at 85,000. And then in the, uh, only entry that I quite frankly, didn't understand in doing this appeal, uh, I was not the trial lawyer in the case. There's an entry by Mr. Washburn for, of other real estate, quote unquote, other real estate. He has by that number of $565,000. So he's listed property that is valued well in excess of a million dollars. Mr. And it's values are values of what the property might be worth wherever fair market value, whatever, but what is the indebtedness taking against it? Uh, if any, that puts a real net value on it. That's correct. Your honor. Uh, we believe that the indebtedness was the same. This is going on simultaneously judge with, uh, the divorce trial and the evidence being presented there. Uh, and it's my understanding judge. And I think our brief demonstrates that, that the debt is the same, nothing changed except for the values and the trial court judge never looked at that issue and tried to resolve that it made anything. I understand your point judge. If the debt changes, it's our understanding that debt did not change. It was just a transfer from, uh, IH Mississippi credit Valley to bluegrass, to the bluegrass bank of the same properties, the same assets and new financing. So, um, that's the reason judge justices in certain places. Um, I might use the number 182,000, uh, or I might say, uh, at one or two points that, um, the, the amount, uh, of loss in this case, uh, by the depreciation, by the reduction of debt and increase in equity, uh, may well, well be above 182,000. And, uh, I think it's something that the court can take a look at and be concerned about. Um, that is the first issue relating to reimbursement. And we feel that, uh, that was incorrectly decided. The second issue that's really a companion issue comes up under justices under section five, five Oh three D the very next section. And that section of the marital code requires that the court make, uh, award the marital property, the marital property of the estate in just proportion. We believe the trial court aired, uh, heard on, on that, uh, decision as well. Um, again, we're criticized by Mr. Roberts three and Mr. Roberts three, uh, that there was so little marital property, that the issue was hardly worth the ink that I wrote about. Uh, uh, because my client, for example, got $13,000 in marital property, approximately as I said earlier, justices, very little marital property in the case. Um, we did not say, and in fact, what we did say in the brief that in the first instance, the court, the trial trial court for this court now has to figure out this reimbursement issue that has to be done first, because until the court decides what assets are subject, the money came from the marital estate, uh, to the non marital estate until you decide, uh, trial judge or otherwise, what the reimbursement amount is that goes back under Illinois law to the marital estate. It doesn't go directly to the opposing party. So consequently, you can't know what the marital estate is to make a just proportions division until you know what the number is. Mr. And each the red light has gone on, and you will have time and reply. Thank you very much, Judge. Thank you, Mr. Roberts. You may respond. Thank you, Your Honor. Um, for the record, my name is Troy Roberts. I represent the petitioner, Appley Timothy Washburn. And if it pleases the court and opposing counsel, I think one of the most important things your honors to look at here, especially given the amount of testimony regarding different values and where money went and what happened is that trial court found my client, the Appley to be more credible in his testimony. Overall, he is portrayed by the other side as somehow being in the business of buying and selling trucks. For instance, his explanation and his testimony was very clear and very credible that he's in the trucking business. And depending on what type of things he has to transport, he may need a different type of vehicle, a different type of trailer. So during this relatively short term marriage, what was going on with the trucking business is is just that he was operating a trucking business. He testified that the money from that was garnered from this trucking business went into a joint account. It was a business slash family account. And it not only went to service debt on towards the trucking business, but it also provided significant compensation for the marital estate. The testimony at trial was that the the income received and coming in went to pay virtually everything related to debt, marital debt. It paid the bills that paid for clothing. It paid for vacations. It paid the in looking what the trial court did. It's clear that the trial court put significant thought into its ruling when it it told the parties and I was not trial counsel either for this, Your Honors. But it's part of the record. The trial court telling the attorneys that he had worked on this many nights and thought about it and came up with the Ford case that neither neither side had provided for the court. And I think rightfully indicated how similar the situation here was to the Ford case. And I've I've obviously cited that case, but it goes back to Albrecht and Snow and Crook. The Supreme Court case that says when you talk about reimbursement, but there has already been compensation towards the marital estate for the marital estate. And in this instance, I believe there's been significant compensation towards the marital estate that there is no right for reimbursement. And that when what the appellant is is asking for in this case is that I'm in essence, I've already been compensated. But now I want to have portions of the Applebee's non marital property, but with no significant argument or no significant contribution to make that argument. The issue with the Morton building, for instance, it was undisputed that my client does not own that Morton building. There were issues surrounding a payment, but the appellant admitted during trial that the my client had been paying the $500 a month to the father that this payment, he needed a place to store his his vehicle, trucking vehicles. If he was not able to use this Morton building, and that's the purpose of him paying rent to his father, he would have to rent somewhere else because he could not store them at the marital residence. He would have to find some place. And this was a place convenient place to not only store his equipment, but also to work on the vehicles. And his testimony was this also saved thousands of dollars a year in being able to store and work on the vehicles on the Morton building. For some reason, the Applebee believes or the appellant, excuse me, believes that there should be reimbursement back relating to the Morton building. And that argument to me just does not make sense because it's on property that's not owned by my client. It's a building that's not owned by my client. It's simply a rental place to store equipment and work on equipment. Where is the Morton building, Mr. Roberts? It's on a separate, it's a separate piece of ground. I think it's one of, it might be one of those divisions where maybe five acres was set off from a farmstead. I'm not quite sure. All I know is that the testimony from both the appellant or the appellee and his father was, that was a separate ground that was owned only by the father. And it's on land separate from the farm that my client does own with his father. And that income from that operation as well went into the same business slash family account that was used to, again, pay for the marital bills, the clothing, the mortgage, the vacations that they would take. And I know opposing counsel has cited in his brief, Nelson wants you to look at the Nelson case. I would argue that that case is an opposite to what we have here. That case showed significant contributions from the individual. I don't remember if it was the husband or the wife to which reimbursement would be proper. Well, here we have the appellant. We really don't know what happened to income that she had, marital income she earned during the marriage. Again, the testimony of my client was found to be more credible. The income that the appellant received went into her own separate account and there was really no evidence at trial as to where that money went. The appellee testified, again, credibly that there was only one bill, a mid-American bill, to which the appellant was paying on. Everything else was being paid during the marriage, paying all the bills, paying for everything coming out of either Washburn Trucking or the farm enterprise, income from that. And that would wane. As both parties testified, I think they spent a lot of money more than at times that they made. And, for instance, in 2013, they had a good year. In 2014 was the year that my client had to take out $36,000 from his retirement in order to make ends meet. So I believe, your honors, I have spelled it out in my brief. I think when you look at the case law that deals with this particular section, which Mr. Andich has indicated, it's very clear that if the marital estate has already received sufficient compensation and there's no significant contribution, then there's no reimbursement that's required. So we would ask the court to give much consideration by the trial court, working overtime in trying to get it right. And I believe that he did. Okay. Any questions from the bench? Justice McCabe? No. Justice Smith? I think he's muted his mic. I've got the mic muted because of Louie, the dog, who's prone to barking jags. So, no, I have no questions. Okay. Thank you, your honors. That was equal barking to both counsel. Was that right, Dan? Yeah, that's right. Okay. Mr. Andich, you may reply. Thank you, Judge. Just a couple brief comments. I want to start with this point about credibility. And Judge Zimmer's finding that he believed that Mr. Washburn was more credible, I would submit to the court that given the language in 503C2A, the words, as I said, twice being shall, reimbursed, I don't think credibility of either witness has anything to do with this issue, Judge. I think that the statute says very plainly, if money comes from one estate and goes to a different estate, that the trial judge shall order that the estate that provided the money shall get it back, Judge. It's not a question. There was no dispute here, Judge, justices on the evidence and what amount was paid from the family expense, $500 on the Morton building or whatever the amount was. There was no dispute about any of those numbers, Judge, and it's not really a credibility issue. But I'm sure your honors will address that issue and resolve it the way you deem appropriate. In addition to the Nelson case, justices, I would like to add McCoy to your list of many cases to look at and read. And the reason I emphasize Nelson and McCoy so much in my brief and ask each of you to read them is because they're your decisions. In 1998 and 1992, the third district issued those two decisions, and very, very ironically, they both came from Rock Island, where, as you know, I'm from. So I'm particularly proud of those decisions. So I think that the facts are very, very similar in terms of payments on the mortgage for a house and for equipment that was used in one of the parties' businesses. I would also add that there is a dispute about the Morton building. Mr. Roberts was certainly correct. We believe and we argued in the case that he has an equity or ownership, Mr. Washburn does, in that Morton building that's on his father's property. And as evidence, we submitted his tax returns. And Mr. Washburn, interestingly, claims that he has no interest at all, but has taken a depreciation deduction on his income taxes returns for multiple years, including on the tax returns that are admitted. So he blames it on his accountant. Judge, speaking of credibility, that is a credibility issue. Whether his accountant blew it, or Mr. Washburn made the mistake, but it happened for multiple years in a row. And I would submit to the court, you can't claim you don't have an ownership interest in a piece of property. At least you can't claim it to the IRS, Judge. And then take a depreciation deduction year after year after year, which was what Mr. Washburn did and why we argued. We didn't make that up. Why we argued that he has an ownership interest and equity position on that building. Finally, the only other thing I'd say, Judge, as my time runs out, I'm still trying to find the lights, Judge. I'm in any Zoom conference I've had, I've not been able to see any lights at all. You're kind of on the yellow, going through the intersection on the yellow. Oh, okay. Thank you. You still have a few, a little bit of time. A little bit of breathing. Yeah. Thank you, Judge. I was just going to say the other issue I raised, and it's well addressed in both briefs, is a dissipation issue. And as to that, Mr. Washburn testifies that the marriage began to break down in November and December of 2014. As a consequence, that's the starting point. We filed a notice of intent to claim dissipation, which shifts the burden under the statute to Mr. Washburn. It was his burden to prove that none of this property was a dissipation of a marital asset. Yet he spent, for four years before the divorce decree is entered, he spent money on buying this truck, buying that truck. There's a $46,000 dump trailer that he forgot about and remembered during the trial, just came back to his recollection. He spends all this money for a four-year period. Every one of those expenditures is a dissipation. That's why we made the argument. Thank you very much, Justice. I appreciate your time. Thank you, Mr. Anditch and Mr. Roberts, both for your arguments in this matter. It will be taken under advisement and written disposition shall issue in this case. I believe the clerk will take you away from the courtroom now and will remain for conferencing. Thank you.